# EXHIBIT C

FILED
5/10/2024 3:28 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Dominique Gadberry DEPUTY

Case 3:24-cv-02016-K   Document 1-3   Filed 08/07/24   Page 2 of 47   PageID 24

CAUSE NO. DC-24-06964
_____

| | | |
|---|---|---|
| **SSCP RESTAURANT INVESTORS LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **JIGNESH N. PANDYA, RONAK J.** | § | |
| **PANDYA, VALENTINO F. DIGIORGIO III,** | § | |
| **KRUPA PATEL, PANDYA RESTAURANT** | § | |
| **GROWTH BRANDS, LLC, PANDYA** | § | |
| **MANAGEMENT, LLC, ENGAGE** | § | |
| **BRANDS, LLC, and BOSTON MARKET** | § | |
| **CORPORATION,** | § | |
| | § | 193rd |
| | § | |
| **DEFENDANTS.** | § | _____ **JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff SSCP Restaurant Investors LLC ("SSCP"), as purchaser of substantially all assets, including all claims, causes of action, and avoidance actions, of Debtors CBHC Liquidating Company, formerly known as Corner Bakery Holding Company ("CB HoldCo"), CBCRC Liquidating Corp., formerly known as CBC Restaurant Corp ("CB OpCo"), and CBCCI Liquidating Inc., formerly known as CBC Cardco, Inc. ("CB CardCo," and collectively with CB HoldCo and CB OpCo, the "Debtors" or "Corner Bakery"), brings this action against Defendants Jignesh N. Pandya ("Jay Pandya"), Ronak J. Pandya ("Ronak Pandya"), Valentino F. DiGiorgio III ("DiGiorgio"), Krupa Patel ("Patel," and collectively with Jay Pandya, Ronak Pandya, and DiGiorgio, the "D&O Defendants"), Pandya Restaurant Growth Brands, LLC ("PRGB"), Pandya Management, LLC ("Pandya Management"), Engage Brands, LLC ("Engage Brands"), and Boston Market Corporation ("Boston Market"), and for cause of action respectfully shows the Court the following:

1

**Introduction**

1.      This action seeks to recover substantial damages suffered by Corner Bakery due to shocking, systemic breaches of fiduciary duties and fraudulent transfers by Defendants.  Jay Pandya, a serial operator of failed restaurant businesses, purchased Corner Bakery (through his son, Ronak Pandya, and PRGB) in October 2020, several months after purchasing Boston Market (through Engage Brands) in April 2020.  Following the purchase of Corner Bakery, Jay Pandya caused it to contract with Pandya Management, a Jay Pandya-controlled entity, to provide the company with accounting, finance, operational, and record-keeping functions.  Under the management contract, Jay Pandya centralized his control of Corner Bakery, installing the D&O Defendants—who were his close family members and associates—as Corner Bakery's entire executive management team displacing executives at Corner Bakery's corporate offices in Dallas, Texas.  Jay Pandya functioned as Corner Bakery's de facto Chief Executive Officer and Chief Operating Officer.  He gave his teenage son, Ronak Pandya, the formal title of President and Chief Executive Officer, and appointed him as one of its two directors.  Jay Pandya also named his close, long-time business associate, Patel, Corner Bakery's Treasurer and made her the sole financial executive.  DiGiorgio, who was appointed as the other director of Corner Bakery and served all its legal and compliance functions, had been a long-time attorney and advisor to Jay Pandya.  When a public scandal forced him to resign from his law firm in 2019, DiGiorgio promptly accepted a position as the General Counsel of Jay Pandya's restaurant businesses, including as General Counsel of Boston Market and Corner Bakery when Jay Pandya acquired them in 2020.

2.      Jay Pandya's total control and influence over Corner Bakery's executive functions which had been located in Dallas, Texas enabled him to conceal from Corner Bakery's creditors that he was bleeding the company dry to benefit himself and his other business ventures.  Under

the D&O Defendants' watch, and while Corner Bakery was insolvent and failing to pay its debts as they came due, Corner Bakery transferred tens of millions of dollars to Pandya Management and Boston Market, without justification and without any benefit or value returned to Corner Bakery.  The transfers to Pandya Management were in many instances recorded on Corner Bakery's books as "management fees," but this was a façade.  The amounts transferred to Pandya Management bore no relationship to, and far exceeded, any amount that Pandya Management could claim as a management fee.  Indeed, Jay Pandya and Patel later confirmed that the purpose of at least some of these transfers to Pandya Management was to conceal assets from Corner Bakery's creditors.  Other transfers to Boston Market were made for Boston Market's benefit, not Corner Bakery's benefit, even though the D&O Defendants desperately tried to rewrite history by later re-recording those transfers as repayments of a loan that Boston Market had made to PRGB to purchase Corner Bakery, and for which Corner Bakery was not liable.

3.      While they were depleting Corner Bakery's cash to benefit Jay Pandya personally, the D&O Defendants neglected and impaired Corner Bakery's critical business functions.  These failures include a near complete dereliction of the finance, accounting, and record-keeping functions that the D&O Defendants were dutybound to perform, that Pandya Management had expressly contracted to provide, and that should have produced periodic reporting that Corner Bakery was required (but failed) to provide to its lenders.  As a result, Corner Bakery's books and records were slipshod and disorganized and financial reporting to its lenders was non-existent.  Its accounting records failed to reconcile, including millions of dollars of cash expended from Corner Bakery's accounts but not recorded.  In late 2022, Corner Bakery's independent auditors belatedly began to review the company's financial statements for 2021, and quickly concluded that they would not be able to issue a clean audit opinion.  The failures of D&O Defendants were particularly

devastating considering Corner Bakery's precarious financial condition.  From as early as October 2020, when Jay Pandya purchased the company, Corner Bakery was insolvent and routinely failed to pay its vendors and employees, yet Jay Pandya continued to siphon off Corner Bakery's cash, further undermining its ability to survive.

4.      After just over two years of controlling Corner Bakery, the D&O Defendants' misconduct caused the company's lender to declare a default and accelerate its indebtedness.  In a last-ditch effort to stave off Corner Bakery's then-inevitable collapse and conceal how he had manipulated the company's finances, Jay Pandya purported to negotiate a reduced payoff of Corner Bakery's debt facility. But, predictably, he reneged on those commitments and failed to satisfy his obligations.  Eventually, Jay Pandya and the D&O Defendants' misconduct and misappropriation of the company's cash left Corner Bakery with few choices other than to seek bankruptcy protection.

5.      SSCP purchased substantially all of Corner Bakery's assets in the bankruptcy case, including its causes of action.  SSCP, therefore, commences this action seeking: (a) to recover damages for the rampant breaches of fiduciary duty by the D&O Defendants; (b) a full and accurate accounting of all the wrongful transfers made to Pandya Management and Boston Market for the benefit of their owners, Jay Pandya, and Engage Brands; and (c) to avoid and recover those wrongful transfers.

### Discovery Control Plan

6.      Discovery is intended to be conducted in this case under Level 2.  TEX. R. CIV. P. § 190.3.

### Parties and Service of Process

7.      SSCP is a Delaware limited liability company with its principal place of business in Dallas, Texas.  SSCP is affiliated with restaurant companies that own and operate multiple

restaurant brands and real estate companies, with more than 400 brand locations across the country. SSCP purchased substantially all assets of Corner Bakery—including claims, causes of action, and avoidance actions—pursuant to this Court's order in the above-captioned bankruptcy case (the "Bankruptcy Case") approving the Asset Purchase Agreement between SSCP and Corner Bakery.[1] Accordingly, SSCP has standing to pursue the claims asserted in this action that formerly belonged to Corner Bakery.

8.  Corner Bakery filed the Bankruptcy Case on February 23, 2023 (the "Petition Date").  Corner Bakery includes three entities: (a) CB HoldCo, a Delaware corporation; (b) CB OpCo, a Delaware corporation; and (c) CB CardCo, a Florida corporation.  CB HoldCo is the sole shareholder of CB OpCo and CB CardCo.  In July 2023, the Debtors changed their corporate names to avoid any confusion with the Corner Bakery assets purchased by SSCP.

9.  Jay Pandya is a resident of, domiciled in, and citizen of Pennsylvania.  Jay Pandya served in multiple capacities with respect to Corner Bakery and its affiliated entities at all relevant times, which he operated under the umbrella of the "Rohan Group of Companies" (the "Rohan Group"), including as: (a) the Managing Director and Chairman of the Rohan Group; (b) the self-described "Chief Executive Officer and Chief Operating Officer" of Corner Bakery;[2] (c) the Managing Member of Pandya Management; (d) the Managing Member and sole member of Engage Brands; and (e) the Chief Executive Officer of Boston Market.  Jay Pandya may be served with process through the Texas Secretary of State as the agent for service for him because he engaged in business in Texas, does not maintain a regular place of business, does not have a designated agent for service of process, and this lawsuit arises in part from his business in Texas.

---

[1] Docket No. 609 in Case No. 23-10245-KBO (Bankr. D. Del.).

[2] Docket No. 22 in Case No. 23-10245-KBO (Bankr. D. Del.).

Jay Pandya may be served with process by serving through the Texas Secretary of State a copy of the citation and petition on him at his home address, which is located at 8 Woodland Road, Newtown, Pennsylvania 18940, and/or at his business address where he regularly conducts business, which is located at 121 Friends Lane, Newtown, Pennsylvania 18940.

10.    Ronak Pandya is Jay Pandya's son, and a resident of, domiciled in, and citizen of either Pennsylvania, where his parents live, or Massachusetts, where he is currently in college. On information and belief, despite being a full-time student with no relevant qualifications, Ronak Pandya served in multiple capacities with respect to Corner Bakery and its affiliated entities at all relevant times, including as: (a) one of the two directors of CB HoldCo and CB OpCo; (b) the President and Chief Executive Officer of CB HoldCo and CB OpCo; and (c) the sole member and President, Treasurer, and Secretary of PRGB. Ronak Pandya may be served with process through the Texas Secretary of State as the agent for service for him because he engaged in business in Texas, does not maintain a regular place of business, does not have a designated agent for service of process, and this lawsuit arises in part from Defendant's business in Texas. Ronak Pandya may be served with process by serving through the Texas Secretary of State a copy of the citation and petition on him at 21 Babson College Drive, Unit 1482, Wellesley Hills, Massachusetts 02481, or at his business address where he regularly conducts business, which is located at 121 Friends Lane, Newtown, Pennsylvania 18940.

11.    DiGiorgio is a resident of, domiciled in, and citizen of Pennsylvania. On information and belief, DiGiorgio served in multiple capacities with respect to Corner Bakery and its affiliated entities at all relevant times, including as: (a) the General Counsel to the Rohan Group; (b) the General Counsel to Boston Market; (c) one of the two directors of CB HoldCo and CB OpCo; and (d) the Secretary/Vice President and General Counsel of CB HoldCo and CB OpCo.

DiGiorgio purported to resign his officer positions at Corner Bakery on or about May 27, 2022, but, upon information and belief, he actually continued serving in these roles until he resigned all Rohan Group positions on or about October 12, 2022. DiGiorgio may be served with process through the Texas Secretary of State as the agent for service for him because he engaged in business in Texas, does not maintain a regular place of business, does not have a designated agent for service of process, and this lawsuit arises in part from Defendant's business in Texas. DiGiorgio may be served with process by serving through the Texas Secretary of State a copy of the citation and petition on him at 215 West Miner Street, West Chester, Pennsylvania 19380.

12.     Patel is a resident of, domiciled in, and citizen of Pennsylvania. On information and belief, Patel served in multiple capacities with respect to Corner Bakery and its affiliated entities at all relevant times, including as: (a) the "Treasurer" of Corner Bakery;[3] (b) Chief Financial Officer of Boston Market; and (c) various financial and other roles with respect to numerous other restaurant and real estate businesses affiliated with Jay Pandya and the Rohan Group since at least 2011, including his other restaurant franchisee and real estate businesses. Patel may be served with process through the Texas Secretary of State as the agent for service for him because he engaged in business in Texas, does not maintain a regular place of business, does not have a designated agent for service of process, and this lawsuit arises in part from Defendant's business in Texas. Patel may be served with process by serving through the Texas Secretary of State a copy of the citation and petition on her at her home address, located at 73 Brecknock Court, Newtown, Pennsylvania 18940.

13.     PRGB is a Delaware limited liability company with its principal place of business located in Feasterville-Trevose, Pennsylvania. PRGB has been the sole shareholder of CB HoldCo

---

[3] Docket No. 79 in Case No. 23-10245-KBO (Bankr. D. Del.).

since October 2020.   PRGB may be served with process through the Texas Secretary of State as the agent for service for PRGB because PRGB engaged in business in Texas, does not maintain a regular place of business, does not have a designated agent for service of process, and this lawsuit arises in part from PRGB's business in Texas.   PRGB may be served with process by serving through the Texas Secretary of State a copy of the citation and petition on PRGB's registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

14.     Pandya Management is a Pennsylvania limited liability company with its principal place of business located in Newtown, Pennsylvania.  Pandya Management may be served with process through the Texas Secretary of State as the agent for service for Pandya Management because Pandya Management engaged in business in Texas, does not maintain a regular place of business, does not have a designated agent for service of process, and this lawsuit arises in part from Pandya Management's business in Texas.  Pandya Management may be served with process by serving through the Texas Secretary of State a copy of the citation and petition on Pandya Management's registered agent, Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110.

15.     Engage Brands is a Delaware limited liability company with its principal place of business located in Feasterville-Trevose, Pennsylvania. Engage Brands may be served with process through the Texas Secretary of State as the agent for service for Engage Brands because Engage Brands engaged in business in Texas, does not maintain a regular place of business, does not have a designated agent for service of process, and this lawsuit arises in part from Engage Brands's business in Texas.  Engage Brands may be served with process by serving through the Texas Secretary of State a copy of the citation and petition on Engage Brands's registered agent,

The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

16.     Boston Market is a Delaware corporation with its principal place of business located in Golden, Colorado.  Engage Brands has been Boston Market's sole shareholder since April 2020.  Boston Market may be served with process through the Texas Secretary of State as the agent for service for Boston Market because Boston Market engaged in business in Texas, does not maintain a regular place of business, does not have a designated agent for service of process, and this lawsuit arises in part from Boston Market's business in Texas.  Boston Market may be served with process by serving through the Texas Secretary of State a copy of the citation and petition on Boston Market's registered agent, The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

### Jurisdiction and Venue

17.     This is an action seeking damages within the jurisdictional limits of the Court. Venue is appropriate in Dallas County, Texas, pursuant to Tex. Civ. Prac. & Rem. Code §15.002 because all or part of the causes of action accrued in Dallas County, Texas.

### Facts Common to all Counts

**A.     Jay Pandya, a Serial Owner of Failed Restaurant Businesses, Buys Boston Market.**

18.     Jay Pandya operates the Rohan Group, which has held ownership interests in many restaurant businesses, including as a franchisee of Dunkin', Pizza Hut, Checkers, Rally's, and other national restaurant franchises.  His restaurant ventures have repeatedly failed amidst a flurry of lawsuits for failing to pay their creditors, including their franchisors, employees, vendors, and taxing authorities.  Along the way, Jay Pandya has developed a pattern of making promises he knew he would never fulfill.  He has also been accused of falsifying documents and defrauding his investors in these failed restaurant ventures.

19.     Jay Pandya began earning this ignominious reputation as early as 2006, when it was alleged that he had bilked three investors out of $610,000 by falsely telling them they would own interests in eight Dunkin' franchises that he was purchasing.  In 2011, Dunkin' sued to terminate its relationship with him on that basis.  Another investor sued Jay Pandya in 2014, claiming that Jay Pandya had defrauded him out of nearly $1,000,000 by offering ownership interests in Pizza Hut franchisees.  The investor alleged that Jay Pandya lied about the purchase price and then altered the closing documents to cover up his lie when the investor requested those documents and that Jay Pandya also refused to return the investor's portion of the down payment for another failed deal.  That investor later obtained a $1.37 million consent judgment against Jay Pandya after he belatedly submitted the first $110,000 payment under a settlement agreement using a check that was returned for insufficient funds.

20.     The unraveling of Jay Pandya's franchisee businesses began to pick up speed in 2018.  Pizza Hut terminated its franchise agreements with Jay Pandya and his affiliated entities in October 2018 because of operational defaults, $1.6 million in unpaid fees, failure to have a qualified operator, and violations of Pizza Hut's brand standards.  Checkers and Rally's also terminated their franchise agreements with Jay Pandya and his affiliated entities in 2019 for failing to pay franchise fees.  After Pizza Hut terminated its franchise agreements, Jay Pandya signed a forbearance agreement with Pizza Hut to facilitate the sale of the restaurants, but he repeatedly defaulted on the agreement, including by making unauthorized store closures, neglecting operational and safety issues, and failing to pay required fees.  Jay Pandya later signed an agreement to cooperate in transferring the remaining restaurant locations to a buyer, but he repeatedly defaulted on those obligations as well.  Pizza Hut eventually sued him for failing to close his stores.  In June 2022, a court awarded Pizza Hut over $6.6 million for breaches of the

franchise agreements as well as injunctive relief related to Jay Pandya's unauthorized use of Pizza Hut trademarks, plus attorneys' fees and costs. Pizza Hut then obtained post-judgment discovery and found that Jay Pandya—true to form—had been fraudulently transferring assets to his wife and other affiliates, and Pizza Hut subsequently sued him *yet again* to recover those transfers.

21.     Likewise, in December 2018, Jay Pandya failed to make required payments on a loan obtained in connection with his Checkers, Rally's, and Pizza Hut franchises. Jay Pandya executed a forbearance agreement with the lender on December 31, 2018, but he defaulted on his payment obligations to the lender within weeks, and at around the same time was sued by various landlords of his franchise locations. In April 2019, the lender successfully had a receiver appointed over Jay Pandya's remaining franchise restaurants.

22.     In April 2020, after his franchised restaurant business had failed, Jay Pandya purchased Boston Market through his wholly owned company, Engage Brands. Since being under Jay Pandya's control, Boston Market has been sued in at least three lawsuits by employees for failure to pay wages at certain Arizona, New York, and Massachusetts restaurant locations, and by numerous vendors for failing to pay amounts owed. For example, US Foods, Inc. recently filed a lawsuit against Boston Market, Engage Brands, and Jay Pandya, alleging that Boston Market had failed to repay an $11.6 million promissory note and guaranty executed in January 2023 relating to unpaid goods.

**B.     Jay Pandya Purchases and Then Bleeds Corner Bakery Dry, Centralizing Control through the D&O Defendants, PRGB, and Pandya Management.**

23.     In October 2020, Jay Pandya, through PRGB, purchased Corner Bakery from Roark Capital Group. Corner Bakery, established in 1991, is a well-known, fast-casual restaurant serving kitchen-crafted breakfast, lunch, and dinner and catering to markets in California, Texas, Pennsylvania, Illinois, Virginia, Maryland, and the District of Columbia. Press releases for the

acquisition touted Jay Pandya's experience and success in the restaurant industry, the benefits of Jay Pandya's "strategic and financial backing," and "opportunities for strategic alliances between Corner Bakery and Boston Market." In an interview with Vanguard Law Magazine in July 2021, DiGiorgio cited Boston Market's successes in returning sales to pre-pandemic levels and stated that Corner Bakery was on track to add 100 additional stores to the 170 it was then operating. But, as with his prior ventures, Jay Pandya used Corner Bakery to fill his own pockets while failing to pay its bills, thereby destroying the brand's image and value.

24.     Shortly after he acquired Corner Bakery, Jay Pandya centralized all of Corner Bakery's accounting, financial, and operational functions in a small group of hand-picked confidants. By doing so, Jay Pandya positioned himself to operate Corner Bakery as his personal slush fund without any oversight, and to conceal that information from outsiders, including Corner Bakery's lenders and other creditors. Moreover, the individuals he charged with management had similar roles at Boston Market and other entities within the Rohan Group, which enabled him to freely utilize Corner Bakery's resources to benefit his other entities.

25.     Jay Pandya installed his then-teenage son, Ronak Pandya, as one of the two directors of Corner Bakery and bestowed him with the ostensible titles of President and Chief Executive Officer of Corner Bakery. Indeed, upon information and belief, Ronak Pandya was a young college student at Babson College. At the same time, Jay Pandya simultaneously held himself out as the company's "Chief Executive Officer and Chief Operating Officer."[4]

26.     Patel was Jay Pandya's long-time business associate who has served numerous roles with Rohan Group companies for more than a decade, where she has made a lucrative living as a result of Jay Pandya's myriad business ventures. Patel's long association with Jay Pandya

---

[4] Docket No. 22 in Case No. 23-10245-KBO (Bankr. D. Del.).

included roles as: (a) the Chief Financial Officer of Rohan Management Services LLC, through which Jay Pandya managed Checkers franchises; (b) a member of Ronak Foods LLC, a former franchisee of multiple Pizza Hut locations; and (c) the past and/or present registered agent for various limited liability companies through which, upon information and belief, Jay Pandya owns real estate for his restaurant franchises, including former Pizza Hut locations.[5]   Jay Pandya appointed Patel as Corner Bakery's sole financial executive.   Upon information and belief, her positions with Jay Pandya-controlled entities was at all relevant times her full-time job and for which she is beholden to Jay Pandya.   Not long after PRGB completed its acquisition of Corner Bakery, Corner Bakery's entire accounting staff promptly left the company.   At that point, Corner Bakery employed only two accountants, both of whom reported directly to Patel.

27.    DiGiorgio had been an attorney at Stradley Ronon Stevens & Young, LLP, a 200-attorney law firm based in Philadelphia, and had long advised Jay Pandya in many business matters relating to his restaurant businesses.   DiGiorgio had also served as the chairman of the Pennsylvania Republican Party.   But in July 2019, after media reports that he sent sexually inappropriate text messages to a city council candidate while serving as the state chairman of a political party, DiGiorgio had promptly resigned from his law firm.   In August 2019, Jay Pandya hired DiGiorgio as the Rohan Group's General Counsel and employed him at a time when, on information and belief, he would not have been considered for other legal positions.   Later, after acquiring Boston Market and Corner Bakery, Jay Pandya tapped DiGiorgio to serve as General Counsel to both of those companies.   DiGiorgio was Corner Bakery's sole legal officer and was

---

[5] These limited liability companies include: (a) 8 New Britain Pizza LLC; (b) Berlin Meats LLC; (c) 1020 Blue Hills Rd, LLC; (d) 401 Kokomo LLC; (e) 839 Greenwood LLC; and (f) 6742 82nd Street LLC.

also one of two Corner Bakery directors.   No doubt, DiGiorgio is beholden to and lacks independence from Jay Pandya.

28.     Jay Pandya also caused Corner Bakery to enter into agreements with his affiliated companies, ostensibly to provide services to Corner Bakery, but which allowed him to further centralize control and drain the company's resources, while keeping his actions concealed from creditors and other outsiders.

29.     ***First***, Corner Bakery entered into a Management Services Agreement dated as of January 27, 2021 (the "MSA") with Pandya Management, of which Jay Pandya is Managing Member and, upon information and belief, he wholly owns.  Jay Pandya signed the MSA on behalf of Pandya Management as its Managing Member, and DiGiorgio signed it on behalf of CB OpCo as its Corporate Counsel.  In the MSA, Pandya Management agreed to "designate employees and contractors" to fill positions at Corner Bakery.[6]  Pandya Management also agreed to provide a "controller and any additional personnel" to serve Corner Bakery's financial management and accounting functions,[7] and a Chief Operating Officer.[8]  But in reality, all of Corner Bakery's executive functions would continue to be performed by the D&O Defendants.

30.     ***Second***, Jay Pandya caused Corner Bakery to "outsource" certain of its operational, accounting, and record-keeping functions to Engage Services LLC ("Engage USA") and/or India-based Engage Business Services Private Limited ("Engage India"), which further limited access to Corner Bakery's information by its creditors and its own employees.

---

[6] MSA § 2.1.

[7] MSA, Ex. A § 1(b)(i).

[8] MSA, Ex. A § 1(a)(i).

31.     Jay Pandya utilized Engage USA to contract with Property Works, which was the property manager for Corner Bakery and Boston Market.  There was no apparent business rationale for Corner Bakery to have contracted with Property Works through a separate Pandya-controlled entity.  Upon information and belief, no written agreement between Corner Bakery and Engage USA exists.  Jay Pandya admitted in filings in the Bankruptcy Case that he is the Managing Member of Engage USA, but he falsely stated that "Engage USA owns Boston Market and has no involvement whatsoever with Corner Bakery."[9]  Engage Brands, not Engage USA, owns Boston Market, which demonstrates that even Jay Pandya himself could not keep track of the purportedly separate roles of his entities.

32.     Engage India is an entity to which Corner Bakery allegedly outsourced certain accounting and bookkeeping functions.  In the Bankruptcy Case, Jay Pandya claimed that he could not turn over some of Corner Bakery's financial books and records because those records were under Engage India's control.  Jay Pandya further stated in the Bankruptcy Case that Engage India is managed by two directors, Dipak Joshi ("Joshi") and Krupal Rathod ("Rathod").  Corner Bakery staff members have stated that Joshi and Rashod were India-based personnel who worked in Corner Bakery's accounting department, but that they had never heard of Engage India.  Upon information and belief, no written agreement between Corner Bakery and Engage India exists.

33.     Jay Pandya's actions demonstrate that he formed and used Engage India to shield Corner Bakery's suspicious transfers and fraudulent accounting from scrutiny.  In March 2021, Patel began to divert certain accounting functions from Corner Bakery's US-based accounting staff to several individuals located in India.  On March 5, 2021, Patel directed Corner Bakery personnel to give accounting system access to Joshi, describing him as a "team member in India who is going

---

[9] Docket No. 626 at 2 in Case No. 23-10245-KBO (Bankr. D. Del.).

to work in Accounting."  In June 2021, Krupa directed Corner Bakery personnel to provide access to the company's accounting software to Rathod, who was presented as a new member of Corner Bakery's accounting department who would work from the "BMO [Boston Market] Office in India."  Then in October 2021, Patel directed a Corner Bakery employee to remove all US-based employees from certain accounting-related email lists, such that emails would only go to Joshi, Rathod, and other India-based individuals.  Per public records, Engage India was formed in December 2021, more than eight months after Joshi joined Corner Bakery's accounting department.

34.     Jay Pandya admits he is a partial owner of Engage India.  Though he denies that he controls Engage India, his extensive connections to Joshi and Rathod strongly suggest otherwise.[10] Joshi and Rathod are directors, officers, and/or agents of entities affiliated with Jay Pandya and Ronak Pandya.  Both have utilized Corner Bakery (cornerbakerycafe.com), Boston Market (bost.com), and "Pandya Group" (pandyagrp.com) email addresses.  Joshi's LinkedIn page states that he works for Pramoda Management Ltd, an entity as to which Jay Pandya, his wife, and Patel are directors.  Public records list Joshi as registered agent of "Boston Chicken Chicken of CT LLC," of which Ronak Pandya is the principal.  Joshi and Rathod are directors of "Corner Bakery Cafe India Private Limited" and "Boston Chicken India Private Limited," which, upon information and belief, are Indian affiliates of Corner Bakery and Boston Market.  In other words, Engage India was yet another entity Jay Pandya utilized to conceal information from Corner Bakery's creditors and employees that were outside his inner circle.

---

[10] Docket No. 626 at 2 in Case No. 23-10245-KBO (Bankr. D. Del.).

C.      **Jay Pandya and the D&O Defendants Grossly Neglect Corner Bakery's Management Functions.**

35.     As officers of the company, the D&O Defendants owed fiduciary duties to perform their management functions with due care and loyalty.  Ronak Pandya and DiGiorgio also owed duties of care and loyalty in fulfilling their roles as Corner Bakery's sole directors.  All of the D&O Defendants' duties were informed by the executive functions that Pandya Management delegated to them under the MSA.  Fulfilling these functions properly was especially important because Corner Bakery had extensive reporting obligations to its secured lenders under its November 2017 credit facility (as amended, the "Credit Facility").  Yet from the time that they became Corner Bakery's directors and officers, the D&O Defendants wholly failed to exercise oversight and neglected to implement systems to carry out Corner Bakery's operational, financial, accounting, or record-keeping functions.  Corner Bakery's corporate office was located in Dallas, Texas.  Corner Bakery's management and staffing were woefully deficient at every level.

36.     *First*, Corner Bakery's operations were regularly interrupted because Jay Pandya, Corner Bakery's self-described "Chief Executive Office and Chief Operating Officer," routinely and consistently ordered the company's employees, located at Corner Bakery's corporate office, not to make payments to vendors, service providers, and landlords.  As a result, Corner Bakery was sued dozens of times over unpaid bills and was subject to numerous proceedings to evict Corner Bakery from its stores.  Jay Pandya and Patel often directed that rent payments be delayed until landlords commenced eviction proceedings, at which time he would decide whether and how much to pay.  Landlords and utility companies frequently locked Corner Bakery's employees out of stores because of the unpaid bills.  At one point, the company was even locked out of its corporate headquarters in Dallas.  A recent article published in *Restaurant Business Online* cites several former Corner Bakery employees who disclosed that Jay Pandya commonly refused to pay

vendor bills after they became due unless the company was given a substantial discount and that as a result, Corner Bakery employees frequently left the company and were not replaced. Given these chaotic tactics and otherwise avoidable disruptions, Corner Bakery struggled to maintain the workforce and vendor relationships necessary to maintain basic operations. To make matters worse, the D&O Defendants comingled Corner Bakery's assets and resources with those of Boston Market, harming the operation of both businesses. For example, because Engage USA contracted with Property Works on behalf of both Corner Bakery and Boston Market, Property Works frequently suspended services to Corner Bakery when services to Boston Market were suspended for non-payment. There were similar incidents involving landlords who had agreements with both Corner Bakery and Boston Market. The allegations in this paragraph are collectively referred to as the "Operational Failures."

37. **Second**, the D&O Defendants had failed to implement useful accounting systems or procedures. Often, the accounting staff located in Dallas, Texas could not efficiently record transactions because they had not been provided with adequate documentation. Instead, they were forced to rely solely on Patel's instructions, which were often inconsistent and lacked even basic documentary support. In some instances, transactions were not recorded until long after the transaction had occurred, and (as in the case of the Boston Market Transfers, defined and described below), Patel would retroactively change accounting entries to suit Jay Pandya's other business interests. In other instances, cash transfers of hundreds of thousands of dollars at a time—totaling at least $7 million—were not recorded in Corner Bakery's general ledger, and at least another $1 million was recorded without any supporting detail. For example, in November and December 2022 alone, bank statements show outgoing wire transfers of $340,000; $500,000; $441,000; $280,000; $300,000; $542,000; $1,000,000; and $1,000,000, none of which were recorded in the

Company's general ledger or include any information about the recipients. Indeed, the D&O Defendants apparently failed to perform any bank or cash reconciliations between May 2021 and February 2023, when the Bankruptcy Case was filed. Corner Bakery's financial records include monthly trial balances for that period that rarely reconciled to zero and the balance sheets prepared showed negative cash balances in 17 out of 22 reported months. These fundamental and repeated errors reveal Pandya Management's critical failure to perform even elementary accounting work in a "professional and competent manner," to "consistently apply the appropriate accounting policies," or to provide "accurate" and "verifiable" information, as required under the MSA.[11] The allegations in this paragraph are collectively referred to as the "Accounting Failures."

38. **Third**, due to Corner Bakery's lack of meaningful systems or oversight, the D&O Defendants commonly failed to complete elementary business or compliance functions, many of which were expressly required under the Credit Facility. For example, Corner Bakery personnel discovered in the summer of 2022 that the company had failed to file income tax returns for 2020 or 2021. In June 2022, Patel disclosed to the accounting staff that that the company had not paid **any** state or federal income taxes in the nearly two years since PRGB had acquired Corner Bakery in October 2020. Aside from the obvious reasons to file tax returns, the Credit Facility explicitly required Corner Bakery to "pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon." In addition, upon information and belief, the D&O Defendants neglected to obtain required insurance coverage required under the Credit Facility, including directors and officers liability insurance. DiGiorgio, as the company's General Counsel, wholly neglected these requirements. The allegations in this paragraph are collectively referred to as the "Compliance Failures."

---

[11] MSA §§ 1, 2.10, 5.1.

39.     **Fourth**, the D&O Defendants consistently failed to prepare meaningful financial reports, including those required to be produced under the Credit Facility.  According to one of its former employees, Corner Bakery ceased any systematic financial reporting shortly after PRGB completed its acquisition of Corner Bakery.  The minimal financial reporting that was done was generated solely by Patel, without conferring with or involving her accounting staff in any meaningful way.  Monthly financial statements were consistently late under the deadlines imposed under the MSA and the Credit Facility, and the financial reports that were prepared were riddled with errors and irregularities.  These failures constituted defaults under the Credit Facility and were a significant factor in driving Corner Bakery into bankruptcy.  The allegations in this paragraph are collectively referred to as the "Financial Reporting Failures."

40.     The Financial Reporting Failures caused Corner Bakery to breach its financial reporting obligations under the Credit Facility, including, among other things, an obligation to report: (a) on a monthly basis, unaudited financial statements and sales information, (b) on a quarterly basis, information concerning leases, franchise agreements, and royalty payments, and (c) on an annual basis, audited consolidated financial statements and information concerning store-level sales and restaurant-level EBITDA.

41.     In May 2022, the agent under the Credit Facility advised Corner Bakery that the company had failed to timely provide the required monthly and quarterly financial statements since June 2021, and had still not provided the annual audited financial statements for fiscal year ended December 31, 2020.  On September 15, 2022, the agent under the Credit Facility advised Corner Bakery that in addition to the previous reporting failures, the company had committed further breaches of the Credit Facility because it had "intentionally refused to provide full and unfettered

access to the Agent and its advisors with respect to all requested financial and accounting information pertaining to the Credit Parties."

42.     Corner Bakery's financial statements were so deficient that its independent auditors notified the company that they would be unable to issue a clean audit opinion on its 2021 financial statements because they appeared to be materially misstated.  Jay Pandya and Patel, in turn, ignored requests from the auditors for supporting documentation to support the company's financial statements, thereby preventing Corner Bakery's auditor from issuing an audit opinion.

**D.     Jay Pandya Siphons Cash from Corner Bakery through Bogus Management Fees.**

43.     Between May 2021 and February 2023, Corner Bakery transferred at least $23.2 million in purported management fees to Pandya Management.  Even without any reduction for Pandya Management's deficient, haphazard, and non-existent services, these transfers were tens of millions more than the management fee formula under the MSA.  Moreover, there were little to no services provided by Pandya Management that could serve as consideration for these purported "fees."  Each transfer of a purported management fee to Pandya Management, which are summarized below and listed in Appendix A (collectively, the "Pandya Management Transfers"), was made not to satisfy a debt, but as part of a long-running scheme to loot Corner Bakery of its cash:

| Month-Year | Amount |
|------------|----------------|
| May-21 | $4,500,000.00 |
| June-21 | - |
| July-21 | $300,000.00 |
| Aug-21 | $300,000.00 |
| Sept-21 | $350,000.00 |
| Oct-21 | $450,000.00 |
| Nov-21 | $500,000.00 |
| Dec-21 | - |
| Jan-22 | $100,000.00 |
| Feb-22 | $2,300,000.00 |

| March-22 | $500,000.00 |
| April-22 | $550,000.00 |
| May-22 | $620,000.00 |
| June-22 | $475,000.00 |
| July-22 | $677,000.00 |
| Aug-22 | $1,040,000.00 |
| Sept-22 | $750,000.00 |
| Oct-22 | $500,000.00 |
| Nov-22 | $860,000.00 |
| Dec-22 | $1,190,000.00 |
| Jan-23 | $5,989,000.00 |
| Feb-23 | $1,285,000.00 |
| **Total** | **$23,236,000.00** |

44.    These transferred amounts bore no relationship to the MSA's management fee formula.  The MSA stated that Pandya's "Base Compensation" (which is the only compensation provided in the agreement) would be "one percent (1%) of Customer's Aggregate Store Gross Revenue (Gross Revenue at all Stores without deduction for costs at those Stores)."   In the Bankruptcy Case, Jay Pandya produced an altered version of the MSA that changed the 1% fee contained in the actual, DocuSign-verified MSA, to a 4% fee (the "Falsified Formula").  Still, these payments far exceeded and bore no relationship to the amounts payable under the inflated, Falsified Formula.

45.    For example, when Pandya Management paid itself $4,500,000.00 in May 2021, it had only accrued $416,665.00 in fees, calculated as 1% of Gross Revenues as defined in the MSA. Even if the 1% had been 4% as in the Falsified Formula, there would have been only $1,666,659 in accrued management fees at the time, almost $3 million less than Pandya Management received. In fact, Pandya Management accrued a grand total of less than the $3.3 million in management fees during the ***entire period of more than two years*** between the MSA and the Petition Date, more than $1.2 million less than the initial $4.5 million it received in the first transfers in May 2021. Even using the Falsified Formula, Pandya Management would have accrued a total of

22

approximately $13 million in fees, more than $10 million less than what it received.  These numbers are reflected in the following table showing the total amounts accrued under the actual 1% MSA formula versus the total amounts of fees paid:

| Month-Year | Fees Paid | Cumulative | MSA | Cumulative | Difference |
|---|---|---|---|---|---|
| Feb-21 | - | - | $81,386.46 | $81,386.46 | $81,386.46 |
| Mar-21 | - | - | $119,981.87 | $201,368.33 | $201,368.33 |
| Apr-21 | - | - | $103,776.19 | $305,144.52 | $305,144.52 |
| May-21 | $4,500,000.00 | $4,500,000.00 | $111,520.28 | $416,664.80 | ($4,083,335.20) |
| June-21 | - | $4,500,000.00 | $144,527.49 | $561,192.29 | ($3,938,807.71) |
| July-21 | $300,000.00 | $4,800,000.00 | $119,627.77 | $680,820.05 | ($4,119,179.95) |
| Aug-21 | $300,000.00 | $5,100,000.00 | $132,776.50 | $813,596.56 | ($4,286,403.45) |
| Sept-21 | $350,000.00 | $5,450,000.00 | $151,787.05 | $965,383.61 | ($4,484,616.39) |
| Oct-21 | $450,000.00 | $5,900,000.00 | $128,372.73 | $1,093,756.33 | ($4,806,243.67) |
| Nov-21 | $500,000.00 | $6,400,000.00 | $134,357.35 | $1,228,113.68 | ($5,171,886.32) |
| Dec-21 | - | $6,400,000.00 | $161,501.78 | $1,389,615.46 | ($5,010,384.54) |
| Jan-22 | $100,000.00 | $6,500,000.00 | $101,276.44 | $1,490,891.90 | ($5,009,108.10) |
| Feb-22 | $2,300,000.00 | $8,800,000.00 | $110,931.13 | $1,601,823.03 | ($7,198,176.97) |
| Mar-22 | $500,000.00 | $9,300,000.00 | $159,716.99 | $1,761,540.02 | ($7,538,459.98) |
| Apr-22 | $550,000.00 | $9,850,000.00 | $130,771.90 | $1,892,311.91 | ($7,957,688.09) |
| May-22 | $620,000.00 | $10,470,000.00 | $139,659.43 | $2,031,971.34 | ($8,438,028.66) |
| June-22 | $475,000.00 | $10,945,000.00 | $158,041.61 | $2,190,012.95 | ($8,754,987.05) |
| July-22 | $677,000.00 | $11,622,000.00 | $122,952.59 | $2,312,965.54 | ($9,309,034.46) |
| Aug-22 | $1,040,000.00 | $12,662,000.00 | $131,120.40 | $2,444,085.94 | ($10,217,914.06) |
| Sept-22 | $750,000.00 | $13,412,000.00 | $158,729.43 | $2,602,815.37 | ($10,809,184.63) |
| Oct-22 | $500,000.00 | $13,912,000.00 | $135,004.08 | $2,737,819.45 | ($11,174,180.55) |
| Nov-22 | $860,000.00 | $14,772,000.00 | $142,099.15 | $2,879,918.61 | ($11,892,081.39) |
| Dec-22 | $1,190,000.00 | $15,962,000.00 | $154,356.69 | $3,034,275.29 | ($12,927,724.71) |
| Jan-23 | $5,989,000.00 | $21,951,000.00 | $102,293.82 | $3,136,569.11 | ($18,814,430.89) |
| Feb-23 | $1,285,000.00 | $23,236,000.00 | $112,069.27 | $3,248,638.38 | ($19,987,361.62) |

46.     The timing of these payments likewise bore no relationship to the MSA's timing for compensation.  Under the MSA, Pandya Management's compensation became due after the closing of the applicable month's books and records and Pandya Management's submission of an

invoice to Corner Bakery, which Corner Bakery had a right to dispute.[12]  Pandya Management was likewise required to submit an invoice for requested expense reimbursement "accompanied by receipts and reasonable supporting documentation."[13]  The MSA expressly granted Corner Bakery "the right to review any invoice or other request for payment, and to dispute any invoice, or portion thereof, that Customer does not believe, in good faith, to be due and owing under this Agreement or any Statement of Work."[14] These payments were not paid in accordance with this schedule, or any ascertainable schedule.  Moreover, Pandya Management failed to submit invoices concerning these fees, or give anyone at Corner Bakery an opportunity to review them.

47.     When Jay Pandya faced obvious questions about these purported management fees in the Bankruptcy Case, he sought to rationalize them by claiming that they were made to protect Corner Bakery's cash from its creditors.  In his First-Day Declaration, Jay Pandya stated that "from time to time the Debtors transferred funds to the management company, and the management company used such funds to make payments to various of the Debtors' vendors and creditors on the Debtors' behalf."[15]  Patel later admitted to the company's Chief Restructuring Officer that Jay Pandya had directed her to transfer roughly $7,274,000 during the period from January 1, 2023, to February 22, 2023, from Corner Bakery's accounts to Pandya Management to pay purported management fees and/or to hide assets from judgment creditors who were seeking to locate and garnish Corner Bakery's bank accounts.[16]  Jay Pandya has stated that Pandya Management then used some of those funds to pay Corner Bakery's vendors on its behalf.  No documentation was

---

[12] MSA § 4, Ex. A § 3.

[13] MSA § 4.2.

[14] MSA § 4.

[15] Docket No. 22 in Case No. 23-10245-KBO (Bankr. D. Del.).

[16] Declaration of Greg Baracato in Support of Emergency Motion of Debtors et. al., ¶14 Docket No. 604 in Case No. 23-10245-KBO (Bankr. D. Del.).

produced in the Bankruptcy Case to explain the Pandya Management Transfers or Jay Pandya's claims about how Pandya Management used the cash.

**E.      Jay Pandya and the D&O Defendants Misappropriate Corner Bakery's Cash to Benefit Boston Market through Sham "Loan Repayments."**

48.      Between June 2021 and December 2021, Corner Bakery transferred a total of $9,200,000 to Boston Market (the "2021 Boston Market Transfers").  The 2021 Boston Market Transfers are listed in Appendix B-1, as summarized below by month:

| Month-Year | Amount |
|---|---|
| June-21 | $1,000,000.00 |
| Aug-21 | $2,000,000.00 |
| Sept-21 | $2,000,000.00 |
| Oct-21 | $2,000,000.00 |
| Nov-21 | $1,200,000.00 |
| Dec-21 | $1,000,000.00 |
| **Total** | **$9,200,000.00** |

49.      When Jay Pandya and Patel made and/or directed the 2021 Boston Market Transfers, Corner Bakery failed to record them in a manner that explained their purpose.  The accounting staff was not provided with any documentation concerning the transactions.  When a member of Corner Bakery's accounting staff asked Patel about the June 2021 payment, Patel curtly responded "This went from AP disbursement to BMC Operating account.  BMC needed funds."

50.      In May 2022, six months after Corner Bakery made the last of these payments to Boston Market, Corner Bakery's accounting staff located in Dallas, Texas asked Patel to clarify the accounting entries for these payments.  Patel instructed that these payments were to be credited against an $11 million transfer Boston Market had purportedly made to Corner Bakery when PRGB acquired Corner Bakery.  No supporting documentation, such as a loan agreement or promissory note, was provided at that time to support Patel's instruction.

51.      In fact, Boston Market *did not* loan $11 million to ***Corner Bakery***.

52.     Under the terms of PRGB's purchase of Corner Bakery, PRGB was required (among other forms of consideration) to pay down $11 million of Corner Bakery's liabilities.  Thus, the $11 million transfer to Corner Bakery was part of the purchase price that PRGB agreed to pay for Corner Bakery.  If Boston Market provided those funds to Corner Bakery, it was because **_PRGB_** borrowed those amounts from Boston Market.   Indeed, Boston Market's contemporaneous accounting records include a note that the payment offset should be to "Engage Affiliate AP."  In October 2021, Boston Market personnel changed that entry on Boston Market's books, likely at Patel's direction, to reflect an intercompany receivable from Corner Bakery.  Likewise, Corner Bakery's independent auditors expressly advised that if the $11 million payment was borrowed from Boston Market, Ronak Pandya (the sole shareholder of PRGB), not Corner Bakery, would have been the borrower, stating: "Ronak Pandya is the shareholder of Corner Bakery Holding Company.  He would have been the individual who provided the $11,000,000 to the company.  If he obtained those funds from Boston Market, then the loan would have been between him and Boston Market."

53.     Nevertheless, Patel caused Corner Bakery's accounting staff to later change the accounting entry to reflect a debt from Corner Bakery to Boston Market.  Jay Pandya and Patel also produced three purported "secured" loan agreements dated October 27, 2020; November 30, 2021; and October 31, 2022, each signed by Ronak Pandya on behalf of Corner Bakery and Jay Pandya on behalf of Boston Market as its Chairman (the "Backdated Loan Agreements"). Evidence strongly suggests that the Backdated Loan Agreements were fabricated and backdated after-the-fact.  Aside from the fact that Corner Bakery had no obligation for the funds it received, there are numerous other indications that none of these loan agreements existed until long after Boston Market transferred the funds in October 2020, including: (a) the first of the loan agreements

is dated October 27, 2020, the day **before** the transaction closed, yet Ronak Pandya signed on behalf of Corner Bakery when he had no authority to act on its behalf; (b) while purportedly signed one year apart from each other, the loan agreements have unique similarities, including that Ronak signed in blue ink and Jay Pandya signed in black ink with a similar handwritten notation that he was signing on behalf of Boston Market; (c) an amendment to the Credit Facility dated October 28, 2020, warranted that all Corner Bakery debt had to be disclosed, yet no loan from Boston Market had ever been disclosed; and (d) the loan agreements never surfaced during numerous discussions in 2021 and 2022 in which Corner Bakery's accounting staff and its independent auditors struggled to understand the nature of the transactions between Corner Bakery and Boston Market.

54.     In late 2022, Corner Bakery transferred an additional $1.45 million to Boston Market (the "2022 Boston Market Transfers").  The 2022 Boston Market Transfers are listed in Appendix B-2, as summarized by month below:

| Month-Year | Amount |
|---|---|
| Sept-22 | $500,000.00 |
| Oct-22 | $750,000.00 |
| Nov-22 | $200,000.00 |
| **Total** | **$1,450,000.00** |

55.     Corner Bakery accounted for these transfers as loan repayments from the outset, but there was no apparent reason for these transfers.

56.     Corner Bakery, therefore, transferred a total of $10.65 million to Boston Market between the 2021 Boston Market Transfers and the 2022 Boston Market Transfers (collectively, the "Boston Market Transfers").

**F.     Jay Pandya Drives Corner Bakery into Bankruptcy.**

57.     In May 2022, the agent under the Credit Facility sent a Notice of Events of Default and Reservation of Rights, which notified Corner Bakery that events of default had occurred under the Credit Agreement, including Corner Bakery's failure to pay amounts due under the Credit Facility and its failure to timely provide financial statements, as discussed above.

58.     In or about July 2022, Corner Bakery agreed to a reduced payoff amount to be paid by September 7, 2022, but Corner Bakery failed to make the required payments.

59.     By letter dated September 15, 2022, the agent under the Credit Facility sent a notice to Corner Bakery advising that the payoff letter had been terminated, accelerating the debt under the Credit Agreement, notifying Corner Bakery of the continuing defaults under the Credit Facility, and notifying Corner Bakery that it intended to exercise its rights and remedies under the Credit Facility.

60.     The parties then executed another payoff letter on October 3, 2022, which required the same payoff amount to be paid by October 31, 2022.  This time, Corner Bakery agreed that it would provide the financial advisor for the agent under the Credit Facility with "full and unconditional access" to Corner Bakery's books and records, "full consultation rights with designated staff and management team members,"  and "full rights to meet and confer with Credit Parties' accountants, prospective purchasers of some or all of the businesses of the Credit Parties and the prospective third party lenders providing financing to such purchasers and/or Credit Parties."

61.     Yet Corner Bakery again failed to make the required payment, and pursuant to a letter dated November 1, 2022, the agent under the Credit Facility terminated the payoff letter,

citing Corner Bakery's failure to comply with its reporting obligations and to provide access to its books and records.

62.     In January 2023, the agent for the Credit Facility conducted a loan sale auction. SSCP was the winning bidder, and the Credit Facility was sold to SSCP effective January 31, 2023.

63.     Corner Bakery ultimately filed the Bankruptcy Case on February 23, 2023.

## CORNER BAKERY'S INSOLVENCY/FINANCIAL DISTRESS

64.     Corner Bakery made the Pandya Management Transfers and the Boston Market Transfers between May 2021 and February 2023 (the "Transfer Period").  Corner Bakery was insolvent during the Transfer Period, with its insolvency beginning no later than October 31, 2020, and continuing thereafter.

65.     Corner Bakery's balance sheet, presented at fair value and adjusted for proper accounting treatment, shows that as of October 31, 2020, the company's value was negative, and the fair value of its liabilities exceeded its assets.  From October 2020 to February 2023, Corner Bakery's balance sheet attributes significant value to intangible assets, including goodwill.  During the same period, Corner Bakery had significant negative net income, earnings, and cash flow, as reflected below:

| Metric/Year | 2020 | 2021 | 2022 | TTM 2023 |
|---|---|---|---|---|
| EBITDA | ($79,844,810) | ($25,926,072) | ($36,129,650) | ($41,093,357) |
| Net Income | ($107,969,765) | ($47,992,140) | ($51,465,052) | ($60,100,525) |
| Net Cash Flow | ($112,434,382) | ($10,098,789) | ($33,377,858) | ($29,961,462) |

Under these circumstances—periodic losses and negative cash flow—ASC 350 and other applicable accounting principles required Corner Bakery to test its goodwill for impairment.  With negative EBITDA, net income, and cash flow, such a test would have likely required a full goodwill impairment no later than January 1, 2020, resulting in a significant impairment charge of over $83 million.

66.     As adjusted for this impairment charge, the Corner Bakery's balance sheet shows the fair value of its assets was approximately $80 million and the fair value of its liabilities was approximately $162 million on October 31, 2020, revealing Corner Bakery to be balance-sheet insolvent with a negative net worth of more than $80 million.  Corner Bakery's adjusted balance sheet continued to show it was insolvent by this measure for each month thereafter until the Petition Date, as reflected below:

**Balance Sheet Test**

| | | 2020 | 2021 | 2021 | 2022 | 2022 | 2022 | 2022 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| Year | | 2020 | 2021 | 2021 | 2022 | 2022 | 2022 | 2022 | 2022 |
| Period | | 10 | 4 | 12 | 3 | 4 | 5 | 6 | 7 |
| Total Assets | | 81,579,338 | 65,987,810 | 57,157,037 | 50,737,611 | 50,807,884 | 51,157,053 | 51,376,605 | 50,249,299 |
| Total Liabilities | | 162,043,630 | 99,332,120 | 115,446,425 | 114,069,010 | 115,719,504 | 116,330,312 | 118,245,031 | 119,358,136 |
| Net Asset Value | | (80,464,292) | (33,344,310) | (58,289,387) | (63,331,399) | (64,911,620) | (65,173,259) | (66,868,426) | (69,108,837) |
| | Test | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL |

| | | 2022 | 2022 | 2022 | 2022 | 2022 | 2023 | 2023 |
|---|---|---|---|---|---|---|---|---|
| Year | | 2022 | 2022 | 2022 | 2022 | 2022 | 2023 | 2023 |
| Period | | 8 | 9 | 10 | 11 | 12 | 1 | 2 |
| Total Assets | | 50,448,235 | 49,579,489 | 48,775,609 | 48,961,065 | 48,602,690 | 42,590,850 | 46,605,413 |
| Total Liabilities | | 120,487,605 | 119,688,409 | 120,461,696 | 125,393,100 | 118,345,138 | 120,292,053 | 128,201,723 |
| Net Asset Value | | (70,039,371) | (70,108,920) | (71,686,087) | (76,432,034) | (69,742,448) | (77,701,203) | (81,596,310) |
| | Test | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL | FAIL |

67.     In addition, as demonstrated by its failure to pay to vendors, service providers, and landlords, Corner Bakery's was also unable to pay its debts as they came due throughout much of this same period.

68.     Corner Bakery continued to be cash drained and insolvent at all relevant points during the Transfer Period, becoming progressively more so because: (a) Jay Pandya continued to loot the company of its cash; (b) the D&O Defendants continued to mismanage the company; and (c) the D&O Defendants continued to engage in poor financial and accounting practices for the company.

69.     Moreover, the Management Fee Transfers and the Boston Market Transfers that Corner Bakery made from at least July 2021 and thereafter were made while Corner Bakery was in default under the Credit Facility.

## Claims

### Count 1
### Avoidance of the Pandya Management Transfers as
### Actual Fraudulent Transfers Pursuant to
### Texas Business & Commerce Code Section 24.005(a) (1)
### (against Jay Pandya and Pandya Management)

70.     SSCP re-alleges the allegations set forth in the above paragraphs.

71.     Corner Bakery made the Pandya Management Transfers from May 2021 through February 2023, totaling $23,236,000.  The details of each of the Pandya Management Transfers are set forth in Appendix A.

72.     The D&O Defendants caused Corner Bakery to make the Pandya Management Transfers with actual intent to hinder, delay, or defraud SSCP.

73.     Corner Bakery made the Pandya Management Transfers with knowledge to a substantial certainty that each transfer was fraudulent as to SSCP and/or would hinder, delay, or defraud it.

74.     Jay Pandya and Patel admitted that at least some of the Pandya Management Transfers were made with the specific purpose of shielding them from a judgment creditor.

75.     The Pandya Management Transfers manifested numerous badges of fraud, including the following:

a.     The transfers were made to Pandya Management, which Jay Pandya, an insider of Corner Bakery, owned and controlled;

b.     Jay Pandya, who controlled Corner Bakery, retained possession and control of the property transferred after the transfer by virtue of his control over Pandya Management;

c.     The transfers were concealed from the Credit Facility agent and lenders;

d.     The transfers were made while Corner Bakery was subject to numerous lawsuits, including lawsuits for its unpaid debts owed to other creditors;

31

e.    Corner Bakery made the transfers under the guise of "management fees," yet the amounts transferred far exceeded any management fees due and the purposes of the transfers, and how they were calculated, were not disclosed in Corner Bakery's books and records;

f.    The value of the consideration received by Corner Bakery, if any, was far less than the value of the cash transferred to Pandya Management; and

g.    Corner Bakery was insolvent both before and after the transfers were made.

76.    The Pandya Management Transfers were fraudulent as to SSCP because SSCP, as the administrative and collateral agent of the Loan, held a claim against the Debtors for past due loan payments before each of the Pandya Management Transfers.

77.    Accordingly, the Pandya Management Transfers are avoidable pursuant to: Texas Business and Commerce Code Section 24.008(a) and similar laws of other jurisdictions that may apply.

## Count 2
### Avoidance of the Pandya Management Transfers as Constructively Fraudulent Transfers Pursuant to Texas Business and Commerce Code Section 24.005(a)(2) (against Jay Pandya and Pandya Management)

78.    SSCP re-alleges the allegations set forth in the above paragraphs.

79.    Pleading further or in the alternative, Corner Bakery made the Pandya Management Transfers from May 2021 through February 2023, totaling $23,236,000. The details of each of the Pandya Management Transfers are set forth in Appendix A.

80.    Corner Bakery did not receive reasonably equivalent value in exchange for the Pandya Management Transfers because the $23,236,000 that Corner Bakery transferred to Pandya Management far exceeded any amounts Pandya Management was entitled to under the MSA. Moreover, Pandya Management failed to adequately provide the services it had contracted to provide under the MSA, which harmed Corner Bakery, and thus, Pandya Management provided no value to Corner Bakery in exchange for the Pandya Management Transfers.

81.     Corner Bakery made the Pandya Management Transfers while it was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

82.     Corner Bakery made the Pandya Management Transfers while it intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

83.     Corner Bakery was insolvent at the time of each transfer because the sum of its debts was greater than the sum of its assets, at a fair valuation, throughout the Transfer Period.

84.     To the extent that Corner Bakery made the Pandya Management Transfers to Pandya Management for an antecedent debt, they are voidable because each transfer was made to an insider of the Debtors while the Debtors were insolvent, and Pandya Management had reasonable cause to believe that Corner Bakery was insolvent at the time of each transfer.

85.     The Pandya Management Transfers were fraudulent as to SSCP because SSCP, as the administrative and collateral agent for the Loan, held a claim for past due loan payments against the Debtors before each of the Pandya Management Transfers.

86.     Accordingly, the Pandya Management Transfers are avoidable pursuant to Section 24.008(a) of the Texas Business and Commerce Code.

**Count 3**
**Breach of Fiduciary Duty**
**(against the D&O Defendants and PRGB)**

87.     SSCP re-alleges the allegations set forth in the above paragraphs.

88.     The D&O Defendants, as officers of Corner Bakery, owed fiduciary duties of loyalty to Corner Bakery under Delaware law, obligating the D&O Defendants to act in good faith, with candor and full disclosure of material information, and in the best interests of the company.

89.     The D&O Defendants, as officers of Corner Bakery, owed fiduciary duties of care to Corner Bakery under Delaware law, obligating the D&O Defendants to act in an informed, deliberate, and rational manner, with candor and full disclosure of material information, and to act prudently in carrying out their duties.

90.     Ronak Pandya and DiGiorgio, who were directors of Corner Bakery in addition to their officer roles, also owed similar fiduciary duties to Corner Bakery under Delaware law in their capacities as directors.

91.     PRGB, as Corner Bakery's sole shareholder, Ronak Pandya, as the sole member of PRGB, and Jay Pandya, who exercised Ronak Pandya's authority as sole member of PRGB, owed similar fiduciary duties to Corner Bakery under Delaware law in those capacities.

92.     The D&O Defendants breached their fiduciary duties of loyalty and care by acting in their own self-interest and/or without independence, with a purpose other than that of advancing Corner Bakery's best interests; by failing to act in good faith, with candor and full disclosure of material information; by failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties; and by acting in a grossly negligent manner.  Their breaches included their actions and inactions in connection with the following:

      a.      the Pandya Management Transfers;

      b.      the Boston Market Transfers;

      c.      the Operational Failures;

      d.      the Accounting Failures;

      e.      the Compliance Failures; and

      f.      the Financial Reporting Failures.

93.     Jay Pandya in particular breached his fiduciary duty of loyalty as an officer and as the individual who exercised PRGB's authority as controlling shareholder by directing the Pandya Management Transfers and the Boston Market Transfers, which were self-dealing transactions that benefitted himself and his other business interests, rather than advancing Corner Bakery's best interests. Jay Pandya also breached his duties of loyalty and care because, in furtherance of and as a result of operating Corner Bakery to benefit himself, he disregarded the executive functions that he was dutybound to perform as Corner Bakery's de facto Chief Executive Officer and Chief Operating Officer, which caused the Operational Failures, the Accounting Failures, the Compliance Failures, and the Financial Reporting Failures.

94.     Patel breached her fiduciary duty of loyalty by directing and executing the Pandya Management Transfers and the Boston Market Transfers, which she knew were self-dealing transactions that benefitted her close, long-time business associate to whom she is beholden, Jay Pandya, and his other business interests, rather than advancing Corner Bakery's best interests. Patel also breached her duties of loyalty and care because, in furtherance of and as a result of operating Corner Bakery to benefit Jay Pandya, she disregarded her duties as Corner Bakery's Treasurer, which caused the Operational Failures, the Accounting Failures, the Compliance Failures, and the Financial Reporting Failures.

95.     Ronak Pandya breached his fiduciary duty of loyalty in connection with the Pandya Management Transfers and the Boston Market Transfers, because as Corner Bakery's Chief Executive Officer, he knew that these transfers were being made and that they were self-dealing transactions that benefitted his father, Jay Pandya, and his other business interests, rather than advancing Corner Bakery's best interests. Ronak Pandya also breached his duties of loyalty and care because, in furtherance of and as a result of operating Corner Bakery to benefit Jay Pandya,

he disregarded his duties as Corner Bakery's Chief Executive Officer, which caused the Operational Failures, the Accounting Failures, the Compliance Failures, and the Financial Reporting Failures. Moreover, Ronak Pandya breached his duties as controlling shareholder and as a director of Corner Bakery by making an improper delegation to Pandya Management and abrogating his duty of oversight, which resulted in systematic failure to implement any reasonable information and reporting systems. This failure of oversight caused or allowed all of the misconduct described above to occur.

96.     DiGiorgio breached his fiduciary duty of loyalty in connection with the Pandya Management Transfers and the Boston Market Transfers, because as Corner Bakery's General Counsel, he knew that these transfers were being made and that they were self-dealing transactions that benefitted his long-time client, Jay Pandya, and his other business interests, rather than advancing Corner Bakery's best interests. DiGiorgio also breached his duties of loyalty and care because, in furtherance of and as a result of operating Corner Bakery to benefit Jay Pandya, he disregarded his duties as Corner Bakery's General Counsel, which directly caused the Compliance Failures, including violations of laws requiring tax returns to be filed and taxes to be paid. Moreover, DiGiorgio breached his duties of oversight as a director of Corner Bakery by making an improper delegation to Pandya Management and wholly abrogating his duty of oversight, which resulted in systematic failure to implement any reasonable information and reporting systems. This failure of oversight caused or allowed all of the misconduct described above to occur.

97.     PRGB breached its fiduciary duties as controlling shareholder of Corner Bakery via the breaches of fiduciary duties described above of its sole member, Ronak Pandya, and Jay Pandya, who exercised Ronak Pandya's authority as sole member of PRGB as Corner Bakery's controlling shareholder.

98.     As a direct and proximate result of their breaches of fiduciary duty, the D&O Defendants caused Corner Bakery to suffer substantial damages, including: (a) at least $23,236,000.00 through the Pandya Management Transfers; (b) at least $10,650,000.00 through the Boston Market Transfers; and (c) additional damages in an amount to be proven at trial.

99.     Accordingly, SSCP is entitled to recover these damages from the D&O Defendants and PRGB.  In addition, SSCP is entitled to disgorge all salaries, bonuses, and other compensation paid to the D&O Defendants while they were breaching their fiduciary duties to Corner Bakery.

### Count 4
### Aiding and Abetting Breach of Fiduciary Duty
### (against Pandya Management, Engage Brands, Boston Market, Jay Pandya, and Patel)

100.     SSCP re-alleges the allegations set forth in the above paragraphs.

101.     As alleged above, the D&O Defendants owed fiduciary duties to Corner Bakery and breached those duties.

102.     Pandya Management, Engage Brands, Boston Market, Jay Pandya, and Patel knew that the D&O Defendants were breaching their fiduciary duties to Corner Bakery.

103.      Pandya Management, Engage Brands, and Boston Market knowingly participated in these breaches of fiduciary duties.

104.     Pandya Management, through its Managing Member, Jay Pandya, knew that the D&O Defendants were breaching their fiduciary duties to Corner Bakery in connection with the Pandya Management Transfers, the Boston Market Transfers, Operational Failures, the Accounting Failures, the Compliance Failures, and the Financial Reporting Failures.  Yet Pandya Management intentionally and substantially assisted the D&O Defendants in such breaches.  For example, (a) Pandya Management, through its Managing Member, Jay Pandya, directed and approved the Pandya Management Transfers and Boston Market Transfers; (b) Pandya Management, by failing to submit invoices to calculate its fees, enabled the Pandya Management Transfers; (c) by failing

to adequately provide personnel to fill Corner Bakery's management functions, Pandya Management was a cause of the Operational Failures, the Accounting Failures, the Compliance Failures, and the Financial Reporting Failures; and (d) Pandya Management requested and accepted the Pandya Management Transfers.

105.    Engage Brands knew, through its Managing Member and sole member Jay Pandya, and Boston Market knew, through (a) its Chief Executive Officer, Jay Pandya, (b) its General Counsel, DiGiorgio, and (c) its Chief Financial Officer, Patel, that the D&O Defendants were breaching their fiduciary duties to Corner Bakery in connection with the Boston Market Transfers and the Operational Failures involving misappropriation and comingling of assets of Boston Market with those of Corner Bakery, to Corner Bakery's detriment. Yet Engage Brands and Boston Market intentionally and substantially assisted the D&O Defendants in such breaches. For example, (a) Patel utilized her position as Boston Market's Chief Financial Officer to manipulate Boston Market's books and records to support recording the Boston Market Transfers as loans to Corner Bakery; (b) Boston Market accounting personnel coordinated with Patel in October 2021 to change Boston Market's books and records to reflect the October 2020 transfer from Boston Market as a loan to Corner Bakery; (c) Jay Pandya signed the Backdated Loan Agreements as Chairman of Boston Market; and (d) Boston Market requested and accepted the Boston Market Transfers.

106.    Jay Pandya knew that the other D&O Defendants were breaching their fiduciary duties to Corner Bakery in connection with the Pandya Management Transfers and the Boston Market Transfers. Yet Jay Pandya, in his capacity as the sole member of Pandya Management and an officer and/or director of Boston Market, intentionally and substantially assisted the other D&O Defendants in such breaches. For example, Jay Pandya (a) caused Pandya Management to request

and accept the Pandya Management Transfers; (b) signed the Backdated Loan Agreements on Boston Market's behalf to support the false claim that the Boston Market Transfers were loan repayments; and (c) caused Boston Market to request and accept the Boston Market Transfers.

107.    Patel knew that the other D&O Defendants were breaching their fiduciary duties to Corner Bakery in connection with the Boston Market Transfers.  Yet Patel, in her capacity as an officer of Boston Market, intentionally and substantially assisted the other D&O Defendants in such breaches.  For example, (a) Patel utilized her position as Boston Market's Chief Financial Officer to manipulate Boston Market's books and records to support recording the Boston Market Transfers as loans to Corner Bakery; (b) Boston Market accounting personnel coordinated with Patel in October 2021 to change Boston Market's books and records to reflect the October 2020 transfer from Boston Market as a loan to Corner Bakery; and (c) Boston Market requested and accepted the Boston Market Transfers.

108.    As a direct and proximate result of their aiding and abetting breaches of fiduciary duty, Pandya Management, Engage Brands, Boston Market, Jay Pandya, and Patel caused Corner Bakery to suffer substantial damages, including: (a) at least $23,236,000.00 through the Pandya Management Transfers; (b) at least $10,650,000.00 through the Boston Market Transfers; and (c) additional damages in an amount to be proven at trial.

109.    Accordingly, SSCP is entitled to recover these damages from Pandya Management, Engage Brands, Boston Market, Jay Pandya, and Patel.

### Count 5
### Accounting
### (against Jay Pandya, Ronak Pandya, Patel, and Pandya Management)

110.    SSCP re-alleges the allegations set forth in the above paragraphs.

111.    As alleged above, the D&O Defendants and PRGB owed fiduciary duties to Corner Bakery and breached those duties.

112.    Jay Pandya and Ronak Pandya, as Corner Bakery's chief executives, and Patel, as Corner Bakery's Treasurer and sole financial executive, were responsible for the company's finance and accounting functions.

113.    Pandya Management agreed under the MSA to provide personnel to serve Corner Bakery's financial management and accounting functions and to perform accounting work in a "professional and competent manner," to "consistently apply the appropriate accounting policies," and to provide "accurate" and "verifiable" information.

114.    Jay Pandya, Ronak Pandya, Patel, and Pandya Management all failed to fulfill their duties to maintain complete and accurate books and records for Corner Bakery, including failing to accurately record Corner Bakery's transfers of tens of millions of dollars to Pandya Management, Boston Market, and other entities associated with Jay Pandya.  Corner Bakery's accounting staff failed to properly record transactions because Patel failed to provide them with documentary support to record transactions.  Some transactions were not recorded until long after the transaction had occurred.  The accounting entries for some transactions (such as the Boston Market Transfers) were changed retroactively to suit Jay Pandya's other business interests.  Cash transfers of hundreds of thousands of dollars—totaling at least $7 million—were not recorded at all in Corner Bakery's general ledger.  At least $1 million in transfers was recorded without any supporting detail.  The D&O Defendants apparently failed to perform any bank or cash reconciliations because many of Corner Bakery's monthly trial balances between May 2021 and February 2023 did not reconcile to zero and the balance sheets showed negative cash balances.

115.    Corner Bakery's financial and accounting records were particularly deficient as they relate to the Pandya Management Transfers.  The purported management fees paid to Pandya Management cannot be reconciled with the MSA.  As alleged above, the Pandya Management

Transfers far exceeded, and bore no relationship to, the management fee formula under the MSA formula, or even the Falsified Formula. The timing of these payments likewise bore no relationship to the MSA's timing for compensation. Pandya Management did not submit invoices or supporting documentation as it was required to do under the MSA. To further complicate matters, Jay Pandya claimed in the Bankruptcy Case that Pandya Management at times directly paid Corner Bakery's creditors on its behalf, but failed to provide supporting documentation.

116.    The D&O Defendants further complicated access to Corner Bakery's accounting records by claiming to have outsourced certain accounting and bookkeeping functions to Engage India. Jay Pandya and Patel apparently used Engage India to shield Corner Bakery's suspicious transfers and fraudulent accounting from scrutiny. Indeed, in the Bankruptcy Case, Jay Pandya denied that he could obtain those records from Engage India to turn them over to the Chief Restructuring Officer.

117.    Jay Pandya, Ronak Pandya, and Patel also actively concealed or disguised transactions involving payments to Pandya Management and Boston Market. For example, as alleged above: (a) Jay Pandya and Patel admitted in the Bankruptcy Case that some transfers to Pandya Management were meant to conceal assets from Corner Bakery's creditors; (b) Jay Pandya produced in the Bankruptcy Case an altered version of the MSA with the Falsified Formula that increased the 1% fee contained in the actual, DocuSign-verified MSA, to a 4% fee; (c) Patel caused Corner Bakery's accounting staff to retroactively change the accounting entries for the 2021 Boston Market Transfers to falsely reflect a debt from Corner Bakery to Boston Market; (d) Jay Pandya and Patel also produced the Backdated Loan Agreements, signed by Ronak Pandya on behalf of Corner Bakery and Jay Pandya on behalf of Boston Market, to support the false claim that the Boston Market Transfers were loan repayments.

118.    The equitable remedy of an accounting is warranted to adjust the accounts between Corner Bakery and its fiduciaries, and to render judgment for the amount ascertained to be due to Corner Bakery as a result.  Jay Pandya, Ronak Pandya, and Patel possess, or could obtain access to, additional books, records and other relevant accounting and financial information that were not produced in the Bankruptcy Case.  Access to that information is integral to understanding the many transfers to Jay Pandya's entities that the D&O Defendants concealed, disguised, or failed to properly account for.  Absent an accounting, the amounts owed by Jay Pandya-controlled entities to Corner Bakery cannot be fully ascertained.

119.    Accordingly, SSCP is entitled to a judgment directing Jay Pandya, Ronak Pandya, Patel, and Pandya Management each to perform a full and accurate accounting of all of Corner Bakery's transfers to or for the benefit of the Defendants from the date that PRGB purchased Corner Bakery in October 2020 through the date that the D&O Defendants relinquished control of Corner Bakery's accounts to the Chief Restructuring Officer in or around May 2023, and to remit to SSCP all funds owed to Corner Bakery.

## Count 6
## Unjust Enrichment
### (against Jay Pandya, Pandya Management, Engage Brands,  and Boston Market)

120.    SSCP re-alleges the allegations set forth in the above paragraphs.

121.    Pleading in the alternative, Pandya Management and Boston Market were enriched as a result of the Pandya Management Transfers and the Boston Market Transfers.  Engage Bands, as Boston Market's sole shareholder, and Jay Pandya, as Pandya Management's and Boston Market's ultimate owner, likewise were enriched by these transfers.  These Defendants unjustly retained the sums received by each of them to the detriment of Corner Bakery.

122.    Corner Bakery was impoverished as a result of the Pandya Management Transfers and the Boston Market Transfers because they were made in exchange for far less than reasonably equivalent value.

123.    There is a direct relationship between the enrichment of these Defendants and the impoverishment of Corner Bakery, as the Pandya Management Transfers and Boston Market Transfers  were made directly from CB OpCo's bank accounts to or for the benefit of Pandya Management, Boston Market, and their owners.

124.    There is no justification for these transfers, which were the product of self-dealing and other misconduct and which were made while Corner Bakery was insolvent and for less than reasonably equivalent value.

125.    Accordingly, in the event the other causes of action asserted herein leave SSCP without an adequate remedy at law as against any of these Defednants, SSCP is entitled to a judgment against each of these Defendants compelling them to disgorge and return the amounts by which they were unjustly enriched.

### Rule 193.7 Notice

152.    Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Plaintiff hereby gives actual notice to Defendants that any and all documents produced by Defendants in this lawsuit may be used against Defendants at any pre-trial proceeding and/or at the trial of this matter without the necessity of authenticating the documents.

### Rule 47 Claim for Relief

153.    As required by Rule 47(c) of the Texas Rules of Civil Procedure, Plaintiff seeks monetary relief over $1,000,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorneys' fees.

**Preservation of Evidence**

154.    Plaintiff hereby requests and demands that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the allegations made the basis of this lawsuit, or the damages resulting therefrom including records, documents, files, correspondence, memoranda, spreadsheets, receipts, email, facsimile, voicemail, text messages, cellular telephone records, calendar entries, and any electronic image, data, or information related to the allegations herein.  Failure to maintain such items or information will constitute spoliation of the evidence.

**Prayer for Relief**

WHEREFORE, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon a full and final trial hereof, Plaintiff have judgment against Defendants, jointly and severally, for:

(i)      Actual damages;

(ii)     Punitive damages;

(iii)    Pre-judgment interest at the maximum rate permitted at law or in equity;

(iv)    Post-judgment interest at the maximum rate permitted at law or in equity;

(v)     Attorneys' fees;

(vi)    Costs of suit; and

(vii)   Such other and further relief, both at law or in equity, to which Plaintiff may show itself to be justly entitled.

Respectfully submitted,


*/s/ J. David Apple*_____
J. David Apple
State Bar No. 01278850
J. DAVID APPLE, P.C.
735 Plaza Blvd., Suite 200
Coppell, Texas 75019
Telephone: (972) 315-1900
Facsimile: (972) 315-1955
Email: jdapple@jdalaw.com

**ATTORNEYS FOR PLAINTIFF**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

J. David Apple on behalf of J Apple
Bar No. 01278850
jdapple@jdalaw.com
Envelope ID: 87624137
Filing Code Description: Original Petition
Filing Description:
Status as of 5/16/2024 12:34 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| J. David Apple | | jdapple@jdalaw.com | 5/10/2024 3:28:12 PM | SENT |
| Darlene TConner | | dtconner@jdalaw.com | 5/10/2024 3:28:12 PM | SENT |